# EXHIBIT A

April 24, 2018

Stellar Acquisition III Inc.
90 Kifissias Avenue
Maroussi 15125
Athens, Greece

Attention:   Mr. Prokopios "Akis" Tsirigakis, Chairman & Co-CEO
             Mr. George Syllantavos, Co-CEO and CFO

Dear Akis & George:

This letter agreement ("Agreement") confirms the engagement of StillPoint Capital, LLC and its registered representative Arun Batavia (sometimes referred to, collectively, as "we" or "Advisor") by Stellar Acquisition III Inc. (sometimes referred to as "you" or "Company") to advise on an institutional capital raise ("Capital Raise Transaction") by the Company in connection with the Company's business combination/merger with Phunware, Inc. ("Merger Transaction"). Pursuant to this Agreement, we will introduce Company on a best-efforts basis to one or more institutional investors listed on Exhibit A hereto (each an "Investor"). Exhibit A may be updated from time to time by mutual Agreement of the parties hereto, as evidenced by their initials next to each of the potential Investors listed on Exhibit A, and Advisor shall be protected on an exclusive basis with respect to Sections 2 and 2A in the event Company enters into a Capital Raise Transaction with one or more investors listed on Exhibit A.

Section 1. Services. Advisor will:

(a)   advise and assist the Company in identifying potential Investors and will on behalf of the Company, contact potential Investors listed on Exhibit A, or as identified by the Company; and

(b)   assist the Company in the course of its negotiation of a Capital Raise Transaction with a potential Investor.

Notwithstanding the foregoing, Company agrees that Advisor has no duties of any kind to Company with respect to the accuracy or completeness of the information provided to Company by Investors in respect of a Capital Raise Transaction, and Company covenants to perform its own due diligence with respect to each such Investor, including, without limitation, Investor's qualifications and suitability to enter into a Capital Raise Transaction. Advisor agrees that documents filed by the Company with the SEC provide adequate initial information to assist Advisor in its outreach process with prospective investors. Following initial discussions (if any) with prospective investors named in Exhibit A, Company may, upon request, provide reasonable access to due diligence materials and transactional documents in connection with Merger

Transaction, under a non-disclosure agreement with one or more investors, in the sole discretion of the Company.

It is understood that the Company will be under no obligation to enter into a Capital Raise Transaction, and the Company will be within its rights to decline any offer made in connection with a Capital Raise Transaction at any time.

It is understood and acknowledged by the Company that the value of the services to be rendered by Advisor under this Agreement is not subject to quantification. In addition, although Advisor will render the services contemplated by this Agreement, Advisor will not be obligated to spend any specific amount of time in so doing. Because Advisor has access to staff persons and others with specialized skills, the services to be provided hereunder may be rendered by any one of that staff and consultants as Advisor determines in its sole discretion; provided, however, that in such event, Advisor will advise such staff and/or consultants of the obligations of confidentiality of the Advisor set forth in the Confidentiality Agreement (defined below) and have such staff and/or consultants agree to be bound by such obligations. Advisor is an independent investment banking firm, and except as otherwise provided herein, it may render services of the same or similar nature to any other person, for entities in the same or similar business lines as the Company.

Advisor hereby represents and warrants to the Company that it is a member in good standing of the Financial Industry Regulatory Authority.

Section 2. Fees. The Company shall pay Advisor for its services hereunder, upon the closing of a Capital Raise Transaction and as otherwise provided in this Agreement, a cash fee equal to two and one-half percent (2.5%) of the capital commitment of each Investor, pursuant to definitive financing documents agreed by and between the Company and each Investor during the term of this Agreement ("Success Fee"), provided, however, the minimum Success Fee payable to Advisor shall be $250,000 in the event the total capital commitments of all Investors are below $10,000,000 in the aggregate. The Success Fee shall be paid at the closing of the Merger Transaction.

Section 2A. Compliance Fees & Expenses. Upon execution of this Agreement, the Company shall pay Advisor a compliance fee of $10,000, payable as follows: $5,000 within five days (5 days) of signing this Agreement, and $5,000 on or before May 31, 2018. Advisor shall submit invoices for each payment. In addition to the fees payable hereunder, and regardless of whether any Capital Raise Transaction is proposed or consummated, the Company shall reimburse the Advisor for all reasonable out of pocket expenses incurred by the Advisor, up to $5,000 in the aggregate, for pre-approved travel, food, lodging and other reasonable out-of-pocket expenses incurred by the Advisor in connection with the services performed pursuant to this Agreement, in each case, promptly after submission of such properly evidenced expenses to the Company. Invoices for out-of-pocket expenses shall be paid ten (10) days from the date of the invoice.

Section 3. Waiver Against Trust. Reference is made to the final prospectus of the Company, filed with the Securities and Exchange Commission ("SEC") (File No. 333-212377)

(the "Prospectus"), and dated as of August 18, 2016. Advisor understands that the Company has established a trust account (the "Trust Account") containing the proceeds of its initial public offering (the "IPO") and from certain private placements occurring simultaneously with the IPO (including interest accrued from time to time thereon) for the benefit of the Company's public stockholders (including overallotment shares acquired by the Company's underwriters, the "Public Stockholders"), and that, except as otherwise described in the Prospectus, the Company may disburse monies from the Trust Account only: (a) to the Public Stockholders in the event they elect to redeem their the Company shares in connection with the consummation of the Company's initial business combination (as such term is used in the Prospectus) (the "Business Combination") or in connection with an extension of the deadline to consummate a Business Combination, (b) to the Public Stockholders if the Company fails to consummate a Business Combination within twelve (12) months after the closing of the IPO (or up to 21 months from the closing of the IPO, as described in more detail in the Prospectus), (c) with respect to any interest earned on the amounts held in the Trust Account, as necessary to pay any franchise or income taxes or (d) to the Company after or concurrently with the consummation of a Business Combination. For and in consideration of the Company entering into this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Advisor hereby agrees on behalf of itself and its affiliates that, notwithstanding anything to the contrary in this Agreement, neither Advisor nor its affiliates does now or shall at any time hereafter have any right, title, interest or claim of any kind in or to any monies in the Trust Account or distributions therefrom to Public Stockholders, or make any claim against the Trust Account (including any distributions therefrom to Public Stockholders), in connection with, based upon, arising out of or in any way relating to this Agreement, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (any and all such claims are collectively referred to hereafter as the "Released Claims"). Advisor on behalf of itself and its affiliates hereby irrevocably waives any Released Claims that Advisor or its affiliates may have against the Trust Account (including any distributions therefrom to Public Stockholders) now or in the future in connection with, based upon arising out of or in any way relating to this Agreement and will not seek recourse against the Trust Account (including any distributions therefrom to Public Stockholders) for any reason whatsoever in connection with, based upon arising out of or in any way relating to this Agreement. Advisor agrees and acknowledges that such irrevocable waiver is material to this Agreement and specifically relied upon by the Company and its affiliates to induce the Company to enter in this Agreement, and Advisor further intends and understands such waiver to be valid, binding and enforceable against Advisor and each of its affiliates under applicable law. To the extent Advisor or any of its affiliates commences any action or proceeding in connection with, based upon, arising out of or in any way relating to this Agreement, which proceeding seeks, in whole or in part, monetary relief against the Company or its Representatives, Advisor hereby acknowledges and agrees that Advisor's and its affiliates' sole remedy shall be against funds held outside of the Trust Account and that such claim shall not permit Advisor or its affiliates (or any person claiming on any of their behalves or in lieu of any of them) to have any claim against the Trust Account (including any distributions therefrom to Public Stockholders) or any amounts contained therein. For purposes of this Agreement, the term "Representatives" with respect to any person shall mean such person's affiliates and its and its affiliate's respective directors, officers, employees, consultants, advisors, agents and other representatives, and in the case of the

Company, its potential financing sources for the Merger Transaction and the Capital Raise Transaction.

Section 4. Indemnity. Because we will be acting on the Company's behalf, it is our practice to receive indemnification. A copy of our standard indemnification provisions (the "Indemnification Provisions") is attached to this Agreement and is incorporated herein and made a part hereof. For the avoidance of doubt, any such indemnification shall in all cases be subject to Section 3 above. Advisor will indemnify the Company for any losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements relating to Advisor's bad faith, gross negligence or willful misconduct in performing services for the Company hereunder.

Section 5. Termination of Engagement. Advisor's engagement hereunder may be terminated by either the Company or Advisor at any time, with or without cause, upon written advice to that effect to the other party; provided, however, that notwithstanding any such termination, Advisor will be entitled to its full fee under Section 2 and Section 2A hereof in the event that at any time prior to the expiration of 24 months after such termination, a Capital Raise Transaction is consummated with any Investor which was identified or introduced by Advisor to the Company, and listed/named in Exhibit A. The termination of this Agreement will not terminate the provisions of Sections 3 through 9 hereof.

Section 6. Confidentiality.

(a) In connection with this Agreement, Advisor will provide to Company the names of and contacts at potential Investors, all of which is confidential information of the Advisor. The Company agrees not to use any of this confidential information for any purpose other than as contemplated by this Agreement and will treat the information as confidential as long as the information remains non-public. Except (i) to its Representatives (who are bound by obligations of confidentiality with respect to such information) as reasonably necessary in furtherance of this Agreement, (ii) as otherwise required by applicable law, regulation, regulatory authority, SEC or stock exchange requirement or legal process ("Legal Requirement") or (iii) as contemplated by this Agreement, the Company will not disclose such confidential information to any third party without the consent of the Advisor.

(b) Advisor acknowledges that the U.S. securities laws and other laws prohibit any person who has material, non-public information concerning a public company from purchasing or selling any of its securities, and from communicating such information to any person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. Advisor acknowledges that, since the Company has no operating business and has been formed solely to consummate a Merger Transaction, and since Advisor is engaged to help the Company locate Investors, Advisor will be privy to material non-public information regarding the Company, including the name or identity of Phunware, Inc. and the proposed terms and conditions of the Merger Transaction and the status thereof ("Company Confidential Information"). Advisor hereby agrees to keep all Company Confidential Information confidential and not to disclose or use the same except to the extent authorized by the Company

in furtherance of the Capital Raise Transaction. Advisor acknowledges and agrees that it will not, directly or indirectly, trade or otherwise engage in the purchase or sale of any securities of the Company until the later of (a) the termination of Advisor's engagement hereunder or (b) the public release of the Company Confidential Information which Advisor is privy to.

(c) Each party hereby agrees that, without the prior written consent of the other party, it will not disclose the terms of this Agreement and will keep the terms hereof confidential except (i) to its Representatives (who are bound by obligations of confidentiality with respect to such information) as reasonably necessary to carry out such party's obligations under this Agreement, (ii) to Phunware, Inc. or its Representatives (subject to obligations of confidentiality with respect to such information) or (iii) as required by Legal Requirement.

Section 7. Public Announcements. Advisor may, at its option and expense and after public announcement of the Capital Raise Transaction, place announcements and advertisements or otherwise publicize the Merger Transaction, the Capital Raise Transaction and Advisor's role in it, which may include the reproduction of the Company's logo and a hyperlink to the Company's website on Advisor's website, and in such financial and other newspapers and journals as it may choose, stating that Advisor has acted as financial advisor to the Company in connection with the Merger Transaction and the Capital Raise Transaction. Further, if requested by Advisor, the Company will include a mutually acceptable reference to Advisor in any press release or other public announcement made by the Company regarding the matters described in this Agreement.

Section 8. Successors and Assigns. The benefits of this Agreement shall inure to the respective successors and assigns of the parties hereto and of the indemnified parties hereunder, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns; provided that the rights and obligations of either party under this Agreement may not be assigned without the prior written consent of the other party hereto and any other purported assignment without such consent shall be null and void.

Section 9. Miscellaneous.

(a) The validity and interpretation of this Agreement shall be governed by the law of the State of New York applicable to Agreements made and to be fully performed therein. Any dispute that arises under this Agreement initially will be mediated by a mutually acceptable mediator to be chosen by Advisor and the Company within 15 days after written notice from either party demanding mediation. Neither party may unreasonably withhold consent to the selection of a mediator, and the parties will share the costs of the mediation equally. Any dispute which the parties cannot resolve through mediation within one month of the date of the initial demand for it by one of the parties may then be submitted to binding arbitration under the rules of the American Arbitration Association. The use of mediation will not be construed under the doctrine of laches, waiver or estoppel to affect adversely the rights of either party. Nothing in this paragraph will prevent either party from resorting to judicial proceedings if (a) good faith efforts to resolve the dispute under these procedures have been unsuccessful or (b) injunctive or

other equitable relief from a court is reasonably necessary to prevent serious and irreparable injury. The parties hereto agree that for any judicial proceeding arising out of this Agreement, the exclusive jurisdiction and venue will be any court of the State of New York located in the City and County of New York, or the United States District Court for the Southern District of New York (and any appellate courts thereof), and the parties agree to accept service by mail sent to the address of the parties as set forth in this Agreement or as notified by written correspondence and made a part hereof. Advisor agrees, and the Company herby agrees on its own behalf and to the extent permitted by applicable law on behalf of its security holders, to waive any right to trial by jury with respect to any claim, counter-claim or action arising out of this Agreement. If any provision of this Agreement shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid or unenforceable, such judgment shall not affect, impair or invalidate the remainder of this Agreement but shall be confined in its operation to the provision of this Agreement directly involved in the controversy in which such judgment shall have been rendered. The parties will substitute for any invalid or unenforceable provision a suitable and equitable provision that carries out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision.

(b) The Company expressly acknowledges that all opinions and advice (written or oral) given by Advisor to the Company in connection with Advisor's engagement are intended solely for the benefit and use of the Company. Such opinions and advice may not be disclosed to any person or entity other than the directors and executive officers of the Company, without the prior written permission of the Advisor.

(c) The Company is a sophisticated business enterprise that has retained Advisor for the limited purposes set forth in this Agreement, and the parties acknowledge and agree that their respective rights and obligations are contractual in nature. Each party disclaims an intention to impose fiduciary obligations on the other by virtue of the engagement contemplated by the Agreement, and each party agrees that there is no fiduciary relationship between them. In connection with this engagement, Advisor is acting as an independent contractor, and not that of an employee, agent, partner or joint venturer or any other relationship, and nothing in this Agreement, including the performance by Advisor hereunder, shall create a, employee-employer, principle-agent, partnership, joint venture or any other relationship with the Company. As an independent contractor of the Company, Advisor shall not have any authority to bind, make any representation or commitment or act on behalf of the Company except as expressly authorized by the Company.

(d) This Agreement, including the "Indemnification Provisions" attachment and exhibits hereto, constitutes the full and entire understanding and Agreement between the parties with regard to the subject matter of this Agreement and supersedes all prior understandings or Agreements with respect thereto. No amendments or modifications of or changes to this Agreement or waiver of the terms and conditions hereof will be binding upon either party, unless approved in writing and signed by both parties. It is further agreed that no failure or delay in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

(e) The headings set forth in this Agreement are for convenience of reference only and shall not be used in interpreting this Agreement. In this Agreement, unless the context otherwise requires: (i) whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa; (ii) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding or succeeding such term and shall be deemed in each case to be followed by the words "without limitation"; and (iii) the words "herein", "hereto" and "hereby" and other words of similar import in this Agreement shall be deemed in each case to refer to this Agreement as a whole and not to any particular portion of this Agreement. As used in this Agreement, the term: (x) "person" shall refer to any individual, corporation, partnership, trust, limited liability company or other entity or association, including any governmental or regulatory body, whether acting in an individual, fiduciary or any other capacity; and (y) "affiliate" shall mean, with respect to any specified person, any other person or group of persons acting together that, directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with such specified person (where the term "control" (and any correlative terms) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise). For the avoidance of doubt, any reference in this Agreement to an affiliate of the Company will include the Company's sponsor, Draper Oakwood Investments, LLC.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to Advisor this Agreement.

Very truly yours,

StillPoint Capital, LLC

By: _____
Name: Heather Osborne
Title: CCO

By: _____
Registered Rep: Arun Batavia


*ACCEPTED AND AGREED AS OF THE DATE FIRST ABOVE WRITTEN:*

Stellar Acquisition III Inc.

By: _____  
Name: Prokopios "Akis" Tsirigakis  
Title: Chairman & Co-CEO

By: _____  
Name: George Syllantavos  
Title: Co-CEO and CFO

# INDEMNIFICATION PROVISIONS

Stellar Acquisition III Inc. (the "Company") agrees to indemnify and hold harmless StillPoint Capital, LLC and its registered representative Arun Batavia (together "Advisor") against any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements (and any and all actions, suits, proceedings and investigations in respect thereof and any and all reasonable legal and other costs, expenses and disbursements in giving testimony or furnishing documents in response to a subpoena or otherwise), including without limitation, the reasonable costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any such action, suit, proceeding or investigation (whether or not in connection with litigation in which Advisor is a party), directly or indirectly, caused by, relating to, based upon, arising out of, or in connection with Advisor's performance of services for the Company under the letter Agreement dated the date hereof between the Company and Advisor to which these indemnification provisions are attached and form a part (the "Agreement"); provided, however, that the Company shall not be obligated to indemnify, defend or hold harmless Advisor for losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements suffered by or paid by Advisor as a result of acts or omissions of Advisor which have been made or not made in bad faith or which constitute willful misconduct or gross negligence.

The indemnification provisions shall be in addition to any liability which the Company may otherwise have to Advisor or the persons indemnified below in this sentence and shall extend to the following: Advisor, its affiliated entities, members, partners, employees, legal counsel, agents and controlling persons (within the meaning of the federal securities laws), and the officers, directors, employees, legal counsel, agents and controlling persons of any of them. All references to Advisor in these indemnification provisions shall be understood to include any and all of the foregoing.

If any action, suit, proceeding or investigation is commenced, as to which Advisor proposes to demand indemnification, it shall notify the Company within 30 days from the time Advisor has any knowledge of such action, suit, proceeding or investigation. Advisor shall have the right to retain counsel which will be reasonably acceptable to the Company to represent it (provided, however, that Advisor shall hire only one law firm and to the extent necessary, local counsel) and the Company shall pay the reasonable fees, expenses and disbursements of such counsel; and such counsel shall, to the extent consistent with its professional responsibilities, cooperate with the Company and any counsel designated by the Company. The Company shall be liable for any settlement of any claim against Advisor only if made with the Company's written consent. The Company shall not, without the prior written consent of Advisor, settle or compromise any claim, or permit a default or consent to the entry of any judgment in respect thereof, unless such settlement, compromise or consent includes, as an unconditional term thereof, the giving by the claimant to Advisor of an unconditional release from all liability in respect of such claim. If the Company makes any indemnity payment hereunder and thereafter a determination is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that the Company did not owe indemnity hereunder, Advisor shall immediately repay all amounts paid pursuant to the indemnity provisions hereunder.

In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification in such case, then the Company, on the one hand, and Advisor, on the other hand, shall contribute to the losses involved in such proportion as is appropriate to reflect (i) the relative benefits received by the Company, on the one hand, and Advisor, on the other hand, (ii) the relative fault of the Company, on the one hand, and Advisor, on the other hand, in connection with the statements, acts or omissions which resulted in such losses, and (iii) the relevant equitable considerations. No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any person who is not also found liable for fraudulent misrepresentation. Notwithstanding the foregoing, Advisor shall not be obligated to contribute any amount hereunder that exceeds the amount of fees previously received by Advisor pursuant to the Agreement.

Neither termination nor completion of the engagement of Advisor referred to above shall affect these indemnification provisions which shall then remain operative and in full force and effect.

For the avoidance of doubt, any indemnification obligations hereunder shall in all circumstances be subject to the provisions of Section 3 of the Agreement.

## Exhibit A

## Name of Potential Investors

Lincoln Park Capital

Bain Capital

Naspers

Silver Lake

Abry Partners

L Catterton

Amasia VC

Macquarie

_____

**Exhibit A (Amended as of 11-8-18)**

**Name of Potential Investors**

Active Owners Fund
Alliance Global Partners
Crestline Investors
Dane Capital Management
Eastern Capital Management
Emperey Asset Management
George Schmitt Family Office
Lincoln Park Capital
Magna Management
Partners For Growth
Richard Mooers Family Office

---

StillPoint Capital, LLC

*[signature: Arun Batavia]*

Arun Batavia
Registered Rep

*ACCEPTED AND AGREED:*

Stellar Acquisition III Inc.

*[signature]*  *[signature]*

Name: Prokopios "Akis" Tsirigakis          Name: George Syllantavos
Title: Chairman & Co-CEO                    Title: Co-CEO and CFO